IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MENDOZA V. HONEYWELL AMERICAN METER CO.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

MARGOT MENDOZA, APPELLEE,

V.

HONEYWELL AMERICAN METER CO., APPELLANT.

Filed May 28, 2024.    No. 23-807.

Appeal from the Workers' Compensation Court: JULIE A. MARTIN, Judge. Affirmed.

Timothy E. Clarke and Eric J. Sutton, of Baylor, Evnen, Wolfe & Tannehill, L.L.P., for appellant.

Michael P. Dowd, of Dowd & Corrigan, L.L.C., for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Honeywell American Meter Co. (Honeywell) appeals from the order of the Nebraska Workers' Compensation Court, which awarded Margot Mendoza temporary total disability benefits and payment of medical expenses and future medical care for an injury she suffered in an accident arising out of and in the course of her employment with Honeywell. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. PLEADINGS

On July 28, 2022, Mendoza filed a petition in the compensation court, alleging that on or about January 28, 2022, she sustained "cumulative trauma injuries secondary to repetitive job

duties to her cervical spine resulting in radicular symptoms down her left arm and right trigger finger" and seeking compensation for that accident and injury.

In its answer, Honeywell admitted that it had employed Mendoza on the date in question, but it denied the other allegations of her petition and alleged that any disability suffered by Mendoza was not attributable to her employment.

## 2. TRIAL

Trial was held before the compensation court on June 26, 2023. The court heard testimony from Mendoza, via an interpreter, and received medical records and other exhibits offered into evidence by the parties. Among other things, the parties stipulated that Mendoza's average weekly wage was $1,040, and that she was off work from February 22, 2022, through April 24, 2022, and from May 18, 2022, through the time of trial.

### (a) Mendoza's Employment

Mendoza was born in Peru and had lived in the United States for more than 20 years prior to trial. She began working for Honeywell in February of 2019, on an assembly line making electrical meters. She rotated about every 2 hours between a station where she assembled cranks, the meter/hydro station, and a station where she screwed down plates. Work at the crank station required prolonged standing and assembling small, lightweight pieces. The next station required Mendoza to lift meters, weighing around 20 pounds, and place them in water to check for leaks. If a meter had a leak, Mendoza had to place it back on the line, repair it, and return it to the water again. Once any leaks were eliminated, Mendoza had to lift the meter and hang it on a line above her head. She estimated that she processed about 90 meters per hour at this station. At the third station, Mendoza placed screws into lids/plates on the sides of the meter and tightened them using a screwdriver. If there was no platform available for her to stand on, she had to reach up to pull down the screwdriver suspended overhead. During her last year at Honeywell, Mendoza frequently worked 10-hour days, which meant performing a second 2-hour shift at the hydro station.

### (b) Prior Neck and Finger Treatment

There was evidence about treatment Mendoza received for neck pain and finger pain (right index, rather than right middle finger, which is the finger at issue in this case) prior to January 2022. In 2009, Mendoza went to the emergency room for "left upper back" pain extending "into her left side" with "some tightness in the muscles with a little bit of soreness into her arm and forearm" following a motor vehicle accident. She was treated and released. The diagnosis was of "[l]eft upper back strain secondary to motor vehicle accident." At trial, Mendoza acknowledged her involvement in the 2009 car accident and subsequent treatment. She described it as a "light accident," testifying that she went to the emergency room to be checked out on the advice of a police officer who responded to the accident, that she did not have to be hospitalized, and that she went "straight to work" afterwards. When asked at trial about the location of the pain she experienced after the 2009 accident, Mendoza responded that she did not remember "because it was a long time ago" and "after that [she] went to work," and she "kept on working for many years."

Nine years later, on November 20, 2018, Mendoza was seen at a health center for a follow up to an emergency room visit for right arm swelling. She presented with facial swelling, neck pain, including tight muscles and no history of trauma, and right breast pain. Heat was recommended for her neck, and she was prescribed Cyclobenzaprine. At a return visit in December, she reported that the medication had resolved her pain. Mendoza denied the need for further treatment, but she indicated that she wanted to keep using the medication because it helped her sleep and that she did have "some" pain if she did not take it. The exam of her neck was normal, and the status of her neck pain was "chronic and resolved."

Mendoza visited the health center again in May 2021. At this visit, she described sharp pain in her right index finger when bending at "the distal interphalangeal joint" and "some swelling to all fingers at times." She also reported neck pain over 4 months that had "worsened" and no known injury. She mentioned that she "[d]oes stand for 8-10 hours" at a time. Examination showed tenderness with palpation of the "bilateral trapezius muscles and posterior neck," "left low back," and "[r]ight index finger at distal interphalangeal joint," but no gross neurological deficits were noted. Mendoza was assessed with what appeared to be osteoarthritis in her finger joint and in her neck with "[p]ossible [sic] just muscle tension or tightness." She was prescribed Cyclobenzaprine for her neck and Meloxicam for her finger pain, and labs were drawn to check for possible osteoarthritis in her fingers. In June, the medical center was preparing to schedule a hand x-ray for Mendoza; during phone contact with the center, Mendoza inquired as to whether she also needed "an x-ray for her neck/back as well." A June 15 staff note in the center's records indicates that someone from the imaging center had sought "clarification on the neck x-ray referral before calling [patient] to schedule." On June 18, a staff member clarified that "as a proxy," she had ordered imaging for Mendoza on June 7 "due to chronic neck."

Mendoza acknowledged her 2021 treatment for neck and finger pain at trial. She agreed that at the time she sought treatment in May 2021, she had been experiencing neck pain for at least 4 months. She testified that it was "a light pain," the doctor gave her medication (she did not remember the name of the medication), and the pain "went away." When asked if she had had other episodes of neck pain prior to 2021, she testified, "No, because I would remember if I had a very strong pain." When asked about a medical note from December 2021 that referenced her having "chronic neck pain," she replied, "No, I do not remember."

(c) January 2022 Accident and Treatment

On January 28, 2022, Mendoza was working the meter assembly line when she experienced pain in her neck and down her left arm so severe that it brought her to tears. She testified that she stopped working at 9 a.m. that morning because the pain was "unbearable." Mendoza reported the pain to her supervisor, and she went home, even though she had more than 5 hours left on her shift. Later that day, she sought medical care at a health clinic where she saw Dr. Cristina Hurlbut.

During Mendoza's January 28, 2022, visit with Hurlbut, she reported left upper back pain, radiating into her neck, shoulder, and down her left arm and fingers. Mendoza reported experiencing these symptoms for 2 weeks and that despite taking over-the-counter pain medication, her pain "keeps worsening as the days go by." Mendoza also reported a burning sensation in "her elbow and upper shoulder" and that she had been experiencing "constant tremors." Hurlbut's notes stated that Mendoza "works doing repetitive motion at [H]oneywell

assembling light fixtures. After 8 hours her LUE hurts." Hurlbut's examination showed muscle spasm in the left trapezius, decreased range of motion in Mendoza's neck, pain with movement and muscular tenderness in her "[c]ervical back," and upper extremity strength of "4/5 BL." Hurlbut's diagnosis was cervical radiculopathy, and her notes state, "Suspect neck pain and radiculopathy with trapezius muscle spasm caused by repetitive motion." Hurlbut prescribed starting a "prednisone taper and after completed could start Celebrex" and noted that Mendoza could "[u]se methocarbamol as needed." Hurlbut referred Mendoza to physical therapy and restricted her to an 8-hour workday with lifting restrictions of "no more than 10 pounds for 4 hours at every day."

Mendoza started physical therapy February 9, 2022. Her primary complaint upon arrival was "neck pain with numbness and tingling in her left arm." Mendoza reported that the pain "first began 1 month ago." She denied any accident and reported working 8-10 hour shifts on an assembly line. Mendoza reported "increased pain working throughout the day." Mendoza informed the therapist that she had not been using her left arm and had been compensating with her right. The therapist's evaluation notes state:

> The results of today's evaluation demonstrates decreased ROM, flexibility, and joint mobility of the cervical spine along with increased trigger points and impaired posture. Additionally, patient demonstrates decreased cervical rotation, positive Spurling's test, increased medial/ulnar nerve tension, and decreased pain with cervical distraction which supports a diagnosis of cervical radiculopathy.[ ]Patient pain appears to be primary [sic] due to the repetitive nature of her job.

By her third visit on February 17, Mendoza acknowledged that her pain decreased during therapy but stated that it returned after she left.

Mendoza testified that when she returned to work with her restrictions, she was assigned to stations where she had to perform more repetitive tasks with her hands ("putting the screws on the lids"). According to Mendoza, she only used her right hand to perform this task because her left hand felt "dead" and she had "lots of cramps going through [her] arm." Mendoza testified that she developed pain and triggering of her right middle finger from the use of her right hand to perform this repetitive task. She stated that she continued to have issues with that finger, testifying that it sometimes feels "like something is pulling [her] bone," "[her] finger goes down," and she has "no control" over it.

During a February 22, 2022, physical therapy appointment, Mendoza reported "needing to look into disability as she [was] no longer able to work." Mendoza saw Hurlbut that same day and reported that the physical therapy and medications had helped her symptoms, but that she still got spasms and pain every time she moved her left arm. Mendoza also reported pain in her right middle finger, denying injury to that finger. She stated that she could bend the finger but that it "gets stuck and it feels like it is being pulled." Additionally, Mendoza reported pain in her left pectoral area with grabbing and repetitive movement, even working within her restrictions. Hurlbut's examination of Mendoza's cervical spine showed spasms and torticollis, decreased range of motion, and pain with movement. Mendoza had decreased strength and grip of the left upper extremity. There was swelling and deformity present in her right hand. Hurlbut's diagnosis of Mendoza's neck pain remained cervical radiculopathy, and Hurlbut ordered an MRI. Hurlbut also

- 4 -

diagnosed flexor tenosynovitis of Mendoza's right middle finger and referred her for an orthopedic evaluation.

On March 9, 2022, Mendoza saw orthopedic surgeon, Dr. Sukchan Lee, for her right middle finger. Mendoza reported numbness in her left upper extremity had caused her to use her right hand more while working on the assembly line at Honeywell, repetitively "putting in screws." Mendoza had been experiencing "swelling and stiffness with triggering" of her right middle finger that worsened with gripping and lifting. X-rays taken that day showed "soft tissue swelling," "[n]o OA," and "[n]o acute changes in bones or soft tissue otherwise." Lee's physical examination of Mendoza's right middle finger detected "full range of motion with palpable triggering." Lee administered a steroid injection to the finger and referred Mendoza to physical therapy. Mendoza reported decreased pain in her right middle finger after completing five therapy visits.

An MRI of Mendoza's cervical spine taken on March 11, 2022, showed "[m]ultilevel cervical disc and uncovertebral joint degenerative changes," "most pronounced at C5-6" with "moderate stenosis;" "[l]eft paracentral disc osteophyte complex at C6-7" that contacted "the subjacent left C7 nerve root" and abutted and mildly contoured the cord, "contributing to a mild degree of spinal canal stenosis;" and, "[m]ultilevel bilateral neural foraminal stenosis most pronounced at C6-7."

At some point Mendoza decided to request time off under the Family Medical Leave Act. Hurlbut was the health care provider who completed the leave request form, and on the form, she indicated that Mendoza was incapacitated from February 22, 2022, through approximately April 7, 2022, and would need a "neurosurgery evaluation due to cervical canal stenosis."

Neurosurgeon Craig H. Rabb evaluated Mendoza on March 31, 2022. Mendoza reported a several month history of "severe neck pain" that worsened when she extended her neck. She also reported having pain in her left arm and hand and stated that it hurt when she tried to raise her hand above her head. Rabb reviewed Mendoza's MRI, which he felt showed a "moderate amount of stenosis at C5-6" and a "disc bulge at C6-7 on the left." Rabb assessed "[c]ervicalgia." His notes state:

> [I]t is hard to recommend surgery at this time[, she has] primarily pain in the neck. She does have some pain in the arm which potentially could possibly [be] due to there [being] disc bulges, but not a main feature of her symptoms. Moreover[,] she has pain in her hands and no paresthesias, which seem to imply against nerve root problem. I believe that this time she should try pain management with some injections. . . .

Mendoza was agreeable to this plan, and Rabb indicated he would make a referral.

Mendoza saw Lee again on April 6, 2022, at which time she reported a 50 percent improvement in the pain in her right middle finger and full resolution of the triggering. Lee's exam showed no synovitis or swelling, full range of motion, and no triggering. Her finger was non tender to palpitation, and she had "5/5" strength "in finger flexors and extensors." Mendoza reported being "happy with her current symptomatic and functional status," and Lee released her to return as needed.

On April 12, 2022, Mendoza was evaluated for pain management services. The doctor who evaluated Mendoza felt that her "severe radiating neck pain" was consistent with the C7 nerve root impingement seen on the MRI. He recommended injections, and he indicated that he would "obtain

pre-authorization from the insurance carrier as needed" and would "schedule the patient accordingly."

Mendoza returned to the health clinic on April 21, 2022, where she saw a doctor other than Hurlbut, to discuss her neck pain that radiated into her arms. Mendoza reported that "[t]he neurosurgeon" did not recommend surgery. She expressed her concern of having "severe pain while lifting heavy objects," stated that she was "unable to go back to work with this pain," but noted that "the pain specialist did not recommend her going on disability without restriction." The clinic doctor gave Mendoza a 10-pound lifting restriction and recommended that she follow up with injections and physical therapy as soon as she could. Mendoza was released to return to light duty work immediately with the lifting restriction.

Mendoza returned to the health clinic again on May 5, 2022, complaining of numbness on the right side of her face, watery eyes, and difficulty finding words. The treating doctor felt she may be suffering from Bell's palsy, but because Mendoza had mild weakness on her right side and slow coordination, the doctor ordered an MRI of the brain to rule out a stroke. The MRI was "[u]nremarkable."

On August 10, 2022, Mendoza sought treatment at the health clinic for a pain in her right knee. Mendoza mentioned not receiving the injections for her cervical radiculopathy. Hurlbut, the treatment provider on that date, stated she would assist in getting the injections scheduled.

On August 16, 2022, Mendoza saw Dr. Timothy A. Burd at "Nebraska Spine + Pain Center." She reported that she began feeling pain from lifting and carrying 18-20 pound meters while working on an assembly line at Honeywell and that she had reported the injury but "Work comp didn't want to cover." The injury date noted in the "Reason for Visit" section of Burd's notes is May 25. Upon examination, Burd detected decreased strength in Mendoza's bilateral upper extremities, no atrophy, and "a negative Hoffmann's." X-rays taken that day showed "degenerative changes at C5-6 with slight degeneration also noted at C6-7." Burd reviewed the MRI taken in March, which he felt showed "severe foraminal stenosis at C5-6 with a left-sided disc herniation at C6-7" that was "consistent with [Mendoza's] current symptoms." Burd's diagnostic impression was muscle weakness of the left upper extremity, left C6-7 herniated disc, cervical spinal stenosis at C5-6, cervicalgia, and pain in the left arm. In his notes, Burd commented that although Mendoza had "a multitude of issues," the primary problem was her left upper extremity pain and weakness. Burd ordered an EMG of Mendoza's left upper extremity and took her off work. Burd noted that it was "difficult for [him] to truly tell [a] sequence of [Mendoza's] injuries," but from "what [he] could] gather, she apparently reported injury to her cervical or visor [sic] in 2021 [sic] and did not have any previous neck injuries prior to her visits for her neck." He stated further that he would "also work with her litigator regarding the time sequence of all these injuries as [Mendoza's] testimony/history was somewhat distorted regarding when her specific injuries were, at least during [their] encounter."

The EMG ordered by Burd was completed on October 6, 2022. The reviewing doctor's notes state that it was a "[n]ormal study" with "no electrodiagnostic evidence of a left cervical radiculopathy, brachial plexopathy, myopathy, or peripheral polyneuropathy." Mendoza saw Burd for a follow up appointment that day. Burd's examination detected left triceps weakness and "pain in the C7 distribution." Burd reviewed the finding of Mendoza's MRI, x-rays, and EMG with her and noted that she was "considering surgery which would include an anterior cervical

decompression fusion C5-C7." Burd performed the surgery on December 19. His postoperative diagnosis was "[s]evere stenosis with herniated nucleus pulposus, left C5-6 and C6-7."

During physical therapy in January 2023, Mendoza reported that since her surgery, she still had pain at the base of her neck extending into the left shoulder and anterior chest region. She also reported significant improvement in her left arm pain, although she indicated that pain "can still come and go." At a post-operative visit with Burd on March 21, Mendoza wondered "if something [was] wrong" as she felt "somewhat different" since her surgery with pain in her left shoulder that radiated into her chest and in neck pain when performing activities of daily living. Upon examining Mendoza, Burd found she had full strength with "some giveaway weakness" in the upper extremities and triggering of her right middle finger that rendered her hand "somewhat weak." Her x-rays taken that day showed "well-positioned instrumentation from C5-C7 with no loosening or subsidence." Burd explained to Mendoza that her symptoms did not fit with what he would normally see 3 months following surgery, especially her complaint of being unable to sit with her head propped up for more than a few minutes. He felt the only reason for her complaints would be potential muscle weakness, observing that she had "no atrophy of note to her cervical spine." Burd prescribed further physical therapy and released Mendoza to return to light-duty work with restrictions of no lifting over 10 pounds, no excessive or repetitive bending, the ability to change positions as needed for comfort, no overhead work or overhead lifting, no reaching greater than 12 inches from the body, no pushing and pulling, and no line work. Shortly before trial, Burd ordered Mendoza to undergo a functional capacity evaluation and to follow up with him after it had been completed.

On March 29, 2023, Mendoza saw orthopedic surgeon, Dr. Todd J. Gaddie, for right middle finger pain. Upon his examination, Mendoza had "tenderness to palpation at the base of the right long finger;" "no active locking and catching," although there was "some stiffness associated with flexion;" and, "no obvious deformities, swelling, or erythema." Gaddie noted that Mendoza had received a prior injection and physical therapy without significant improvement or relief of symptoms, and he discussed a trigger release procedure with her. Gaddie noted that Mendoza wished to proceed with surgery.

(d) Burd's Reports

Mendoza's attorney informed Burd via letter that Mendoza began experiencing pain in her neck, shoulder, arm, and back, while performing her job at Honeywell, and provided Burd with a detailed description of Mendoza's job duties. Her attorney also provided the definition of "accident" pursuant to Nebraska caselaw and stated his belief that Mendoza's accident occurred "on 1/18/2021 [sic] followed by a defined course of medical care." Mendoza's attorney summarized the treatment Mendoza received for her neck, both before and after the January 2022 accident, starting with an office visit on May 18, 2021 (which the attorney stated was not "identified as the accident date due to the resolution of symptoms, lack of medical follow up care and restrictions"). The attorney then posed a series of questions for Burd to respond to by checking "Yes" or "No." Burd's responses are dated January 12, 2023. Specifically, Burd marked "Yes," in response to whether, "[c]onsidering the repetitive nature of [Mendoza's] employment," she "sustained a substantial aggravation of a preexisting cervical degenerative condition secondary to her repetitive job activities causing the same to become symptomatic and necessitating her seeking

- 7 -

medical care." Burd agreed that Mendoza's symptoms of muscle spasm in her left arm, difficulty at work with repetitive grabbing, the development of numbness in the left upper extremity, worsening neck pain with extension, hypersensitivity and trigger points around her bilateral upper trapezius, neck pain radiating into her arms with a burning sensation, and the results of the March 11, 2022, MRI all supported the diagnosis of work-related cervical radiculopathy. He also agreed that the change in Mendoza's job duties and restricted use of the left upper extremity led to overuse syndrome impacting her right hand. Burd opined that the need for the anterior cervical decompression and fusion at C5-C7 was consistent with the objective cervical MRI findings and the diagnosis of work-related cervical radiculopathy. And, he agreed that Mendoza would remain totally disabled until she received the proposed surgical care.

In a subsequent report dated March 31, 2023, Burd affirmed that the surgery he had performed was to address Mendoza's January 2022 work-related cervical injury and resulting radiculopathy. He also stated that since Mendoza was "only 3 months out from surgery," she had not reached maximum medical improvement (MMI), and he agreed that the restrictions he imposed on March 21 were reasonable and necessary while Mendoza recovered.

### (e) Gaddie's Report

In response to certain questions posed by Mendoza's attorney, Gaddie authored a report dated April 7, 2023. Gaddie was asked his opinion about whether Medoza's cervical injuries and resulting radicular symptoms limiting the use of her left arm resulted in "an overuse syndrome of the right hand including the development of the trigger finger." Gaddie responded by outlining certain "AMA Guides" and then stating that "[Mendoza's] repetitive grip and repetitive force with the right upper extremity due to a lack of ability to use the left upper extremity would more likely than not lead to development of a trigger finger," according to the referenced AMA Guides. With respect to whether "the continued performance of repetitive job activities utilizing the right had further aggravate[d] the middle finger trigger finger of the right hand," Gaddie opined that "repetitive grip and repetitive force, as well as awkward posture repetitively would be more likely to lead to aggravation of the long trigger finger." In response to whether Mendoza's "reported symptoms" were "consistent with overuse syndrome resulting in development of a right trigger finger," he opined that "[Mendoza's] clinical findings were consistent with the trigger of the long finger." Finally, because conservative treatment had failed, Gaddie recommended surgical intervention in the form of "a trigger finger release."

### (f) Evaluation by Cornett

Dr. Chris A. Cornett, an orthopedic surgeon, conducted an Independent Medical Examination of Mendoza on April 5, 2023. In addition to taking a history and conducting an examination of Mendoza, Cornett reviewed "all available records and imaging," and he was provided certain background information in a letter from Honeywell's attorney. Cornett's report indicated that the attorney told him Mendoza alleged having sustained a significant neck injury as a result of repetitive work activities culminating on January 28, 2022. The attorney also told him that Mendoza was employed by Honeywell as an assembly line worker prior to her injury, that most of her work was done at waist to chest level, that the power tools she used hung on spring-loaded instruments next to the workstation, and that it did not appear she engaged in

significant overhead lifting or prolonged use of her arms in an overhead or outstretched position. And, the attorney advised that Honeywell's "primary concern" was whether Mendoza had suffered an accident and injury arising out of and in the course of her employment, which concern was "highlighted by the fact" that Mendoza had evidence of multilevel degenerative disc disease throughout the cervical spine and had experienced cervical symptoms prior to 2022.

Upon examination of Mendoza, Cornett noted "no focal strength or sensory deficits" in her upper extremities; "some discomfort" with range of motion testing of her neck, but no deficits; and no atrophy, clonus, or evidence of myelopathy. He noted "some diffuse effort-related weakness" that appeared to be related to pain but no specific neurological weakness. Based upon his examination of Mendoza and review of her medical records, Cornett stated that "her diagnosis would be consistent with preexisting degenerative disc disease and as well as some stenosis with neck pain and primarily left upper extremity symptoms/radiculopathy."

In response to the question of whether Mendoza's diagnosed condition was causally related to repetitive work activities at Honeywell, Cornett opined:

I think that is very difficult to say. There is a description of an injury in Dr. Burd's note as I reviewed above, but really that is the only note that described that sort of injury. She also had some prior symptoms within a year back in 2021. . . . There is no specific injury that I can relate. Her imaging report describes a degenerative condition. Therefore, in my opinion, I cannot state that her condition is causally related to her work activities at Honeywell, and it seems to be related to an underlying degenerative condition.

As to whether Mendoza required surgery to treat her diagnosed condition, Cornett felt surgery or a decompression and fusion for cervical stenosis that was symptomatic and did not respond to other treatment was a reasonable option, but he opined that Mendoza's surgery was "more likely related to the natural progression of her preexisting condition" than to her repetitive work activities at Honeywell. According to Cornett, Mendoza should be able to return to activities as tolerated after a temporary period of restrictions after her surgery. And, he opined that any restrictions Mendoza had would be related to her preexisting condition and not her work activities. Cornett opined that Mendoza had reached MMI and did not need any additional medical treatment. Additionally, Cornett stated if Mendoza did have a work injury "as outlined in Dr. Burd's note," it would be "more consistent with a strain" and that she should have reached MMI within 3 months of that injury.

3. AWARD

The compensation court entered an award of benefits to Mendoza on September 15, 2023. Relying on the opinions of Burd and Gaddie, the court found that Mendoza sustained injury to her neck with radicular symptoms and right trigger finger as a result of an accident on January 28, 2022, arising out of and in the course of her employment with Honeywell. The court ordered Honeywell to pay for medical expenses incurred by Mendoza and future medical care and treatment reasonably necessary as a result of the accident and injuries, as specified in the award. The court also awarded certain periods of temporary total disability benefits to Mendoza. We have set forth further details of the court's analysis as necessary below.

# III. ASSIGNMENTS OF ERROR

Honeywell asserts that the compensation court erred in (1) relying on the opinions of Burd and Gaddie to find that Mendoza suffered compensable work injuries, (2) not relying on the opinion of Cornett, and (3) awarding indemnity and medical benefits to Mendoza.

# IV. STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Reissue 2021), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Espinoza v. Job Source USA*, 313 Neb. 559, 984 N.W.2d 918 (2023).

Determinations by a trial judge of the Workers' Compensation Court will not be disturbed on appeal unless they are contrary to law or depend on findings of fact that are clearly wrong in light of the evidence. *Id.* In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, an appellate court considers the evidence in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence. *Cajiao v. Arga Transp.*, 30 Neb. App. 700, 972 N.W.2d 433 (2022).

# V. ANALYSIS

## 1. SUFFICIENT COMPETENT EVIDENCE

Honeywell challenges the compensation court's reliance on the opinions of Burd and Gaddie to conclude that Mendoza's neck and finger injuries were causally related to her work accident. Honeywell argues that the opinions of Burd and Gaddie were insufficient to support the court's award of benefits to Mendoza and that the court should have relied instead on the opinion of Cornett to conclude Mendoza was not entitled to benefits.

In order to recover under the Nebraska Workers' Compensation Act, a claimant has the burden of proving by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment proximately caused an injury which resulted in disability compensable under the act. *Hintz v. Farmers Co-op Assn.*, 297 Neb. 903, 902 N.W.2d 131 (2017). A proximate cause is a cause that produces a result in a natural and continuous sequence and without which the result would not have occurred. *Moyera v. Quality Pork Internat.*, 284 Neb. 963, 825 N.W.2d 409 (2013).

To recover workers' compensation benefits, an injured worker is required to prove by competent medical testimony a causal connection between the alleged injury, the employment, and the disability. *Contreras v. T.O. Haas*, 22 Neb. App. 276, 852 N.W.2d 339 (2014). Unless its nature and effect are plainly apparent, an injury is a subjective condition requiring an expert opinion to establish the causal relationship between the employment and the injury or disability. *Kaiser v. Metropolitan Util. Dist.*, 26 Neb. App. 38, 916 N.W.2d 448 (2018). Although a claimant's medical expert does not have to couch his or her opinion in the magic words "reasonable

medical certainty" or "reasonable probability," the opinion must be sufficient to establish the crucial causal link between the claimant's injuries and the accident occurring in the course and scope of the claimant's employment. *Moss v. C&A Indus.*, 25 Neb. App. 877, 915 N.W.2d 615 (2018). An appellate court examines the sufficiency of a medical expert's statements from the expert's entire opinion and the record as a whole. *Id.* The value of an expert witness' opinion is no stronger than the facts upon which it is based. See *Hintz v. Farmers Co-op Assn., supra.*

(a) Reliance on Burd's Opinions

Honeywell argues that Burd's opinions are insufficient to support an award of benefits to Mendoza because they do not discuss all of the medical treatment Mendoza received for neck pain prior to January 2022 in a manner sufficient to render his conclusions reliable and persuasive. Honeywell argues that Burd's failure to address Mendoza's treatment prior to 2022 (in his opinions or in office visit notes) shows that he was not in possession of all the relevant facts and did not have an adequate basis for his opinions.

In addressing the similar arguments Honeywell made at trial, the compensation court stated:

> From the evidence, the [c]ourt cannot see that [Mendoza] had been involved in any accident [prior to January 2022] where she injured her neck. She did not have specific complaints of neck pain following a car accident in 2009, only upper back pain. The [c]ourt will not make the leap suggested by [Honeywell] that this is similar to her neck pain twelve years later and is not persuaded to find this singular event for upper back pain with no other treatment or follow up is causally responsible for her condition in 2022. More pertinent, however, are the complaints of neck pain in the few years before her accident. When questioned [at trial] about the pain in 2018, [Mendoza] stated it could not have been that bad as she does not remember it. She admitted to neck pain in 2021 but claimed it got better. The records show that any prior symptoms were not lasting in nature. Her complaints resolved after one visit and with some medication. She was able to perform her job duties without restrictions or accommodations. Dr. Burd had been made aware of her prior treatment [in 2021] and the resolution of her pain. He had reviewed her MRI and x-rays and knew of the degenerative changes in the cervical spine. His expert opinion was an aggravation of her preexisting degenerative cervical condition secondary to her work, which the Court finds is an opinion consistent with the information in his possession.

> [Mendoza] never denied having neck pain prior to her date of accident. Her unrefuted testimony is that any previous pain was 'light' and it resolved, which is supported by the medical records. The pain she experienced working in hydro on January 28, 2022, was so severe it brought her to tears. It is the first time the Court sees that her condition prevented her from performing her work activities. The pain she suffered on this date did not abate with one medical appointment as in the past, and even with continued treatment, she was eventually forced to take a leave of absence from her job. The Court found her testimony compelling.

The compensation court's review of the record is consistent with our own. There is nothing in the record to show that the injury to Mendoza's upper back in 2009 involved her cervical spine.

Any symptoms she experienced in 2009 and 2018 appear to have been resolved with minimal treatment. Mendoza's attorney did advise Burd of the treatment Mendoza received in 2021 when seeking his medical opinion in this case, and Burd was able to review the degenerative changes to Mendoza's cervical spine on various imaging tests throughout his treatment of her. Honeywell argues that because Cornett addressed all of Mendoza's prior treatment in his report, his opinion is more reliable. However, this court examines the sufficiency of a medical expert's statements from the expert's entire opinion and the record as a whole. See *Moss v. C&A Indus.*, 25 Neb. App. 877, 915 N.W.2d 615 (2018).

Here, the compensation court accepted the opinion of Burd with respect to the causation of Mendoza's neck injury over that of Cornett as it was entitled to do. The trial judge in a workers' compensation case is entitled to accept the opinion of one expert over another. *Michie v. Anderson Builders*, 22 Neb. App. 731, 859 N.W.2d 906 (2015). If the record contains evidence to substantiate the factual conclusions reached by the trial judge of the compensation court, an appellate court is precluded from substituting its view of the facts for that of the compensation court. *Eddy v. Builders Supply Co.*, 304 Neb. 804, 937 N.W.2d 198 (2020). The court did not err in relying on Burd's opinions to conclude that Mendoza sustained injury to her neck with radicular symptoms as a result of an accident arising out of and in the course of her employment with Honeywell on January 28, 2022.

### (b) Reliance on Gaddie's Opinions

With respect to the compensation court's reliance on Gaddie's opinion, Honeywell argues that Gaddie's opinions expressed in his report "are not a model of clarity." Brief for appellant at 22. Gaddie was asked if Mendoza's "cervical injuries and resulting radicular symptoms limiting the use of her left arm resulted in an overuse syndrome of the right hand including the development of the trigger finger." Gaddie responded that Mendoza's "repetitive grip and repetitive force with the right upper extremity due to lack of ability to use the left upper extremity would be more likely than not to lead to the development of a trigger finger according to the AMA Guides," which were outlined previously in his response. Honeywell argues that this response does not address Mendoza's cervical conditions with specificity, explain how or whether they would result in a lack of ability to use the left upper extremity, or lead to the development of a trigger finger. Honeywell notes Gaddie's statement in his report that "repetitive grip and repetitive force, as well as awkward posture repetitively would be more likely to lead to aggravation of the long finger trigger," and it argues that Gaddie did not specifically state that Mendoza's work for Honeywell caused her trigger finger. Finally, Honeywell notes that when asked if Mendoza's symptoms were "consistent with overuse syndrome in development of a right trigger finger," Gaddie opined that "[Mendoza's] clinical findings were consistent with the trigger of the long finger." Honeywell argues that in this response, Gaddie did not address the overuse syndrome aspect of the question posed to him.

In addressing the causation of Mendoza's right middle trigger finger, the compensation court stated:

> Due to the injury to her neck with pain going down her left arm and a heavy feeling in her left hand, [Mendoza] stated she relied mostly on her right hand. Because of the work restrictions placed upon her for her neck injury, she was assigned to an area where she performed repetitive tasks. Again, her description of her repetitive duties has not been

shown to be inaccurate. While repetitively putting screws on the lids, she felt like her bones were being pulled apart on her right middle finger. The pain she experienced in 2018 was to her index finger, not the middle finger, so no preexisting condition has been shown to be responsible for her current complaints.

Dr. Gaddie opined her condition was related to her work activities. There is no expert evidence to refute his opinions.

The court then noted its role as the trier of fact to determine which, if any, expert witnesses to believe. The court stated that although Honeywell had raised "some thought-provoking arguments in defense of this claim," the court was more persuaded by and adopted the opinions of Burd and Gaddie. The court was persuaded by the evidence as a whole to find that Mendoza met her burden of proving she sustained injury to her neck resulting in radicular symptoms and right trigger finger as a result of an accident arising out of and in the course of her employment with Honeywell on or about January 28, 2022.

We find no error in the compensation court's reliance on Gaddie's opinion. While he might have been more precise in the words he used in response to the questions posed to him by Mendoza's attorney, he was not required to couch his opinion in certain magic words to establish the causal link between the injury to Mendoza's finger and her work-related accident, and we examine the sufficiency of his statements from his entire opinion and the record as a whole. See *Moss v. C&A Indus.*, 25 Neb. App. 877, 915 N.W.2d 615 (2018). As discussed above, the record supports the court's conclusion that Mendoza suffered a work-related neck injury and that as a result of that neck injury she was assigned to repetitive work tasks and relied on the use of her right hand to perform those tasks. Gaddie's opinion supports a conclusion that Mendoza's repetitive use of her right hand caused her right middle trigger finger condition. The court did not err in relying on Gaddie's opinion to conclude that Mendoza sustained a right middle trigger finger injury as a result of an accident arising out of and in the course of her employment with Honeywell on January 28, 2022.

(c) Failure to Rely on Cornett's Opinion

Honeywell also assigns that the compensation court erred in not relying on Cornett's opinion and argues that his medical report was the most reliable because it addressed all of Mendoza's pre-injury medical treatment. Having found no error in the court's reliance on the opinions of Burd and Gaddie, we need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Picard v. P & C Group 1*, 306 Neb. 292, 945 N.W.2d 183 (2020).

2. AWARD OF INDEMNITY AND MEDICAL BENEFITS

Honeywell assigns that the compensation court erred in awarding indemnity and medical benefits to Mendoza. Honeywell argues that because Burd's reports do not adequately address Mendoza's pre-injury medical treatment "the only competent medical evidence sufficient for factual finding" is Cornett's report. Brief for appellant at 26. Honeywell argues further that because Cornett's report "makes clear that [Mendoza] did not sustain any permanent injury as a result of her work for [Honeywell]," the court erred in finding that Mendoza suffered a work-related injury

on January 28, 2022, and awarding benefits based on that injury. We have already addressed Honeywell's arguments above about the court's reliance on the sufficiency of Burd's and Gaddie's opinions with respect to a causal connection between Mendoza's accident and injury. Because the court did not err in relying on the opinions of Burd and Gaddie to find that Mendoza suffered a compensable neck injury on January 28 (and a subsequently resulting finger injury), it did not err in awarding indemnity and medical benefits to Mendoza based on that finding.

### 3. MENDOZA'S REQUEST FOR ATTORNEY FEES

We note Mendoza's request in her brief for an award of attorney fees on appeal. Pursuant to Neb. Rev. Stat. § 48-125(4)(b) (Reissue 2021):

> If the employer files an appeal from an award of a judge of the compensation court and fails to obtain any reduction in the amount of such award, the Court of Appeals or Supreme Court shall allow the employee a reasonable attorney's fee to be taxed as costs against the employer for such appeal.

Because Honeywell appealed and did not obtain any reduction in the amount of the award to Mendoza, she is entitled to attorney fees on appeal. Our rules of appellate procedure require those seeking the award of such relief to file a motion supported by an affidavit justifying the amount sought "within 10 days after the release of the opinion of the court or the entry of the order of the court disposing of the appeal, unless otherwise provided by statute." Neb. Ct. R. App. P. § 2-106(G) (rev. 2024). If Mendoza wishes to pursue an award of attorney fees and costs under § 48-125(4)(b), she may file such a motion in accordance with the rule set forth above.

### VI. CONCLUSION

The compensation court did not err in relying on the opinions of Burd and Gaddie in concluding that Mendoza's neck and finger injuries were causally related to her work accident and in awarding indemnity and medical benefits based on that finding.

AFFIRMED.